IN THE SUPREME COURT OF NORTH CAROLINA

No. 318A17

Filed 7 December 2018

ANDREA MORRELL, G. PONY BOY MORRELL, and THE PASTA WENCH, INC.

v.

HARDIN CREEK, INC., JOHN SIDNEY GREENE, and HARDIN CREEK TIMBERFRAME AND MILLWORK, INC.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 803 S.E.2d 668 (2017), reversing an order of summary judgment entered on 27 April 2016 by Judge William Coward in Superior Court, Watauga County, and remanding for further proceedings. On 1 November 2017, the Supreme Court allowed defendants' petition for discretionary review of additional issues. Heard in the Supreme Court on 14 May 2018 in session in the Old Burke County Courthouse in the City of Morganton pursuant to N.C.G.S. § 7A-10(a).

*Capua Law Firm, P.A., by Paul A. Capua and Genevieve A. Mente, for plaintiff-appellees.*

*Wall Babcock LLP, by Joseph T. Carruthers and Lee D. Denton, for defendant-appellants.*

MORGAN, Justice.

This contract interpretation case concerns the operation of the provisions of a commercial real estate lease, specifically those terms regarding insurance and liability, when a lessee seeks damages allegedly caused by the lessor's negligence.

The specific question before this Court is whether the pertinent provisions of the lease at issue serve as a complete bar to plaintiff lessees' negligence-based claims against some or all of the named defendants, one of which is the lessor. The language of the lease arrangements indicates the clear intent of the parties to discharge each other from all claims and liabilities for damages resulting from hazards covered by insurance, and it is undisputed that the damages claimed by plaintiff lessees resulted from a hazard that was subject to their insurance coverage. Having elected to enter into the lease at issue here, plaintiff lessees are bound by the explicit terms of the contract and therefore are barred from bringing their claims against other parties to whom the lease applies. Accordingly, we reverse the portion of the decision of the Court of Appeals holding that a critical paragraph in the lease is ambiguous and that, as a result, interpretation of the contract was a matter for a jury to resolve. We remand this matter for further proceedings as described below.

Factual and Procedural Background

Beginning in early 2011, defendant Hardin Creek, Inc. (Hardin Creek), a North Carolina company, began leasing commercial premises in Boone to plaintiff The Pasta Wench, Inc., a specialty pasta manufacturing and distribution business owned and operated by plaintiffs Andrea Morrell and her husband, G. Pony Boy Morrell (G. Morrell). The initial lease, dated 2 February 2011, covered the time period from February 2011 through February 2014, and defined "Landlord" as "Hardin Creek,

Inc." and "Tenant" as "Andrea Morrell and G. Morrell (D.B.A.) The Pasta Wench, Inc." Defendant John Sidney Greene (S. Greene) signed the lease as President of Hardin Creek, and both Andrea and G. Morrell signed on behalf of themselves and The Pasta Wench. No other parties or third-party beneficiaries were named in or signed the lease.

The lease was a standard form lease prepared by Hardin Creek, and it included, *inter alia*, several provisions regarding insurance and liability. Relevant to the parties' arguments in this case are portions of two paragraphs. Paragraph 5, titled "Alterations," discusses The Pasta Wench's right, as "Tenant," to alter or remodel the premises to suit its needs and further states in pertinent part:

> (b) Tenant's Neglect. Subject to the provisions set forth in the following sentence, Tenant shall pay for the cost of any repairs or damage resulting from the negligence or the wrongful acts of his employees, representatives or visitors. However, and notwithstanding any other provision of this lease to the contrary, Landlord and Tenant and all parties claiming under them agree and discharge each other from all claims and liabilities arising from or caused by any hazard covered by insurance on the leased premises, or covered by insurance in connection with the property owned or activities conducted on the leased premises, regardless of the cause of the damage or loss, provided that such cause does not prevent payment of insurance proceeds to Landlord under the provisions of the applicable policy.

Paragraph 8, titled "Insurance," provides in its entirety:

> Tenant shall maintain insurance in accordance with the provisions of sub[-]paragraphs (a) and (b) of this

paragraph, and Tenant shall indemnify Landlord in accordance with the provisions of sub-paragraph (c).

(a) Property Insurance: Tenant shall hold Landlord harmless for loss or damage by fire with regard to all of Tenant's furniture, fixtures, and equipment about or within the leased premises.

(b) Liability Insurance: Tenant shall provide and keep in force for the protection of the general public and Landlord liability insurance against claims for bodily injury or death upon or near the leased premises and the sidewalks, streets and service and parking areas adjacent thereto to the extent of not less than $500,000.00 in respect to bodily injur[i]es or death to any one person and the extent of not less than $500,000.00 for bodily injuries or death to any number of persons arising out of one accident or disaster, and property damage with limits of not less than $100,000.00. The Tenant shall furnish Landlord with satisfactory evidence of such insurance within thirty (30) days of execution of this lease.

Despite the reference in the first sentence of Paragraph 8 to "sub-paragraph (c)," there is no subparagraph (c) in Paragraph 8.

In early 2012 an inspection by the North Carolina Department of Agriculture and Consumer Services (NCDA&CS) revealed the need for modifications to the interior layout of the premises to comply with pertinent state regulations governing The Pasta Wench's food production activities. Specifically, the inspection noted the need for the addition of an enclosed ceiling for the "open" kitchen that was being used by lessees Andrea and G. Morrell in their business. Lessees discussed the NCDA&CS requirements with S. Greene and his son, John Ellis Greene (E. Greene). Both S. and E. Greene are licensed general contractors, with the two of them having different

business connections to the leased premises. E. Greene owned the building containing the premises that plaintiffs leased, as well as the real property on which the building sits. In addition to owning lessor Hardin Creek, S. Greene also owned and operated defendant Timberframe and Millwork, Inc. (Timberframe), a construction company in the business of building and remodeling residential and commercial buildings.

After learning of the applicable regulatory requirements, Hardin Creek agreed to undertake the kitchen ceiling enclosure project in exchange for the Morrells' promise to extend the term of the lease from February 2014 through December 2018. An "Amending Agreement" attached to the 2011 lease also imposed a series of rent increases, the first of which went into effect on 1 June 2012. However, the Amending Agreement specifically provided that "[a]ll other terms and conditions from the original lease . . . will stay in effect." The parties do not dispute that the insurance and liability-related provisions of the 2011 lease quoted and discussed herein therefore remained in operation at all times relevant to this case.

The kitchen ceiling enclosure project was completed, but in their respective pleadings and depositions in the present case, the parties dispute who performed and supervised the renovation work. S. Greene denied that either he or Timberframe was involved and claimed that the Morrells themselves had supervised the project as the lessees. But, Adam Voss, an employee of Timberframe, testified that he performed

the work while employed and being paid by Timberframe and at the direction of S. Greene. Voss also testified that all work on the ceiling project was conducted under the supervision of S. Greene and Timberframe alone. G. Morrell likewise testified that S. Greene had supervised and completed the project using Timberframe personnel.

The kitchen ceiling enclosure project was later discovered to have violated both general building codes and mechanical codes for fire sprinkler systems. The flawed nature of the work to enclose the ceiling of the kitchen was discovered after the mountain municipality of Boone experienced extremely low temperatures in January 2014, causing the fire sprinkler pipes on the leased premises to burst, to flood the Morrells' leased business space, and to destroy the lessees' inventory, ingredients, and specialty equipment. As the lessees, the Morrells claimed that these losses prevented The Pasta Wench from filling pending orders and that they halted new sales. Although the lessees had obtained insurance on the premises that covered the hazard of flooding, nevertheless the benefit limits of the policy that they purchased were insufficient to cover their alleged losses such that The Pasta Wench went out of business.

On 3 December 2014, plaintiff lessees filed an action in Superior Court, Watauga County, alleging negligence and breach of the duty of workmanlike performance against Hardin Creek, S. Greene, and Timberframe; constructive

eviction and breach of contract against Hardin Creek; and unfair trade practices against S. Greene and Hardin Creek. In their complaint, plaintiffs asserted that, after the flooding, they discovered acts and omissions attributable to Hardin Creek, Timberframe, and S. Greene which plaintiffs claim caused, or contributed to, the frozen pipes in the sprinkler system. These allegedly negligent acts and omissions included leaving a vent open near the roof so as to allow the entry of cold air, and establishing a thermal barrier between the newly enclosed kitchen and the open area above it, so as to render the thermostat ineffective for regulating the temperature above the kitchen ceiling where the fire sprinkler system pipes were located.

On 2 March 2015, defendants Hardin Creek, S. Greene, and Timberframe (the original defendants) filed an answer. Along with general denials and admissions, the answer averred that "plaintiffs and defendant Hardin Creek" were the only parties to the lease and that "the other two defendants [S. Greene and Timberframe] did not provide any services to plaintiffs in their (i.e., defendants') names." The original defendants also raised four affirmative defenses: plaintiffs' contributory negligence, assumption of risk, failure to mitigate damages, and the economic loss doctrine. Hardin Creek also reserved its "right to assert other affirmative defenses that become known through discovery." The original defendants also moved to dismiss plaintiffs' negligence, breach of warranty, and unfair and deceptive trade practices claims pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6). On 8 March 2016, Hardin Creek amended the answer and added two counterclaims, one alleging that plaintiffs had breached

their duty to maintain the premises and the other contending that plaintiffs had violated the terms of the lease. Hardin Creek sought monetary damages for these counterclaims.

On 14 April 2016, the original defendants moved for summary judgment contending, *inter alia*, that plaintiffs' claims against S. Greene and Timberframe must be dismissed because they were not parties to the lease and any work that was performed by Timberframe was on Hardin Creek's behalf. In addition, the original defendants asserted that the lease discharged Hardin Creek "from all claims and liabilities arising from or caused by any hazard covered by insurance . . . regardless of the cause of the damage or loss" pursuant to Paragraph 5(b) of the lease. On the next day, plaintiffs moved to amend their complaint to add E. Greene as a party defendant, alleging negligence and breach of the implied warranty of workmanlike performance. On the same date, plaintiffs filed a motion to continue and to extend the previously determined scheduling deadlines. On 22 April 2016, plaintiffs filed a third-party complaint against E. Greene, bringing all claims alleged in their complaint against him.

On 25 April 2016, the Honorable William Coward heard arguments on all parties' motions. On 27 April 2016, the trial court granted summary judgment in favor of defendants and dismissed the complaint with prejudice. The trial court found that: (1) plaintiffs "presented no plausible reasons why further discovery would shed

any light on [P]aragraph 5(b) in the Lease," and (2) "[P]aragraph 5(b) in the lease is not ambiguous and is a complete defense to the claims raised in the Complaint." The trial court *sua sponte* granted summary judgment in favor of plaintiffs on Hardin Creek's counterclaims. Finally, the trial court dismissed with prejudice plaintiffs' third-party complaint against E. Greene and dismissed as moot plaintiffs' motion to amend complaint and motion to continue. Plaintiffs filed their notice of appeal to the Court of Appeals on 20 May 2016.

At the Court of Appeals, plaintiffs argued that the trial court erred in granting summary judgment in favor of defendants. Specifically, plaintiffs contended that the language of Paragraph 5(b) of the lease—that the parties "discharge[d] each other from all claims and liabilities arising from or caused by any hazard covered by insurance . . . regardless of the cause of the damage or loss, provided that such cause does not prevent payment of insurance proceeds to Landlord under the provisions of the applicable policy"—was ambiguous in that it did not clearly reflect the intent of the parties to bar *negligence* claims against each other. A majority of the Court of Appeals panel agreed with plaintiffs, concluding that the trial court's summary judgment ruling was erroneous. *Morrell v. Hardin Creek, Inc.*, ___ N.C. App. ___, 803 S.E.2d 668, 675 (2017). In reaching that result, the majority opined that the references in Paragraph 5(b) to "any hazard covered by insurance" and "payment of insurance proceeds" require that this provision be read in conjunction with Paragraph 8 of the lease, which

purports to define the type and amount of insurance [d]efendants required [p]laintiffs to carry. Paragraph 8 also includes the terms under which [p]laintiffs would indemnify [d]efendants for damages covered by insurance. However, Paragraph 8 is incomplete. The opening sentence of Paragraph 8 states "Tenant shall maintain insurance in accordance with the provisions of subparagraphs (a) and (b) of this paragraph, and Tenant shall indemnify Landlord in accordance with the provisions of sub-paragraph (c)." The text of subparagraphs (a) and (b) follow this sentence. Subparagraph 8(a), titled "Property Insurance," contains indemnification language and states [p]laintiffs hold Hardin Creek harmless for damages or losses caused by fire to [p]laintiffs' furniture, fixtures, and equipment. Subparagraph 8(b), titled "Liability Insurance," defines the types and amounts of liability insurance [d]efendants required [p]laintiffs to carry. There is not a Subparagraph 8(c).

Both [P]aragraph 5(b) and Paragraph 8 refer to limits on Hardin Creek's liability under the lease. The incomplete construction of Paragraph 8 creates an ambiguity as to the type and amount of insurance Hardin Creek required of [p]laintiffs. The incomplete construction of Paragraph 8 also creates an ambiguity relating to the scope of [P]aragraph 5(b). The language the trial court relied on in [P]aragraph 5(b) refers to any "hazard covered by insurance on the leased premises." However, when [P]aragraph 5(b) is read in connection with Paragraph 8, the exact meaning of the term "covered by insurance" is ambiguous. It is unclear whether that term refers to hazards covered only by insurance coverage as required by the lease, or whether that term is modified by the language in the missing subparagraph on indemnification.

*Id.* at ___, 803 S.E.2d at 674. The majority went on to observe that, even if the lease was unambiguous as to indemnification, the majority still would have concluded that Paragraph 5(b) did not serve as a bar against claims arising out of negligence because a "contract will never be so interpreted [to exempt liability for negligence] in the

absence of clear and explicit words that such was the intent of the parties.' *Id.* at ___, 803 S.E.2d at 674 (alteration in original) (quoting *Winkler v. Appalachian Amusement Co.*, 238 N.C. 589, 596, 79 S.E.2d 185, 190 (1953)). Based upon its own cases applying this reasoning, the Court of Appeals reversed the trial court's entry of summary judgment in favor of all defendants and remanded the matter for further proceedings. *Id.* at ___, 803 S.E.2d at 674-76. The court further determined that it could not "review or resolve the issue of the various [d]efendants' degree of involvement in modifying the sprinkler system from our record on appeal" and added that "[t]his is an issue for the trial court which the trial court may be able to resolve upon motion for directed verdict." *Id.* at ___, 803 S.E.2d at 675-76. On remand, the trial court was also directed to "resolve and reconsider [p]laintiffs' motion to add E. Greene as [ ] a defendant to this action" because the trial court's denial of that motion in the first instance was a consequence of its order granting summary judgment in defendants' favor. *Id.* at ___, 803 S.E.2d at 676.

The dissenting judge would have held that the trial court's grant of summary judgment in favor of defendants was proper, based on his conclusion that Paragraph 5(b) "is unambiguous and operates as a complete defense to [all] claims raised by [p]laintiffs." *Id.* at ___, 803 S.E.2d at 676 (Berger, J., dissenting). Quoting *Gibbs v. Carolina Power & Light Co.*, 265 N.C. 459, 467, 144 S.E.2d 393, 400 (1965), for the proposition that "when the language of the contract and the intent of the parties are clearly exculpatory, the contract will be upheld," the dissenting judge found that the

language in Paragraph 5(b)—"notwithstanding any other provision of this lease to the contrary, Landlord and Tenant . . . agree and discharge each other from all claims and liabilities arising from or caused by any hazard covered by insurance . . . , regardless of the cause of the damage or loss"—showed that "the parties clearly and explicitly waived all claims, including claims for negligence." *Id.* at ___, 803 S.E.2d at 676-78. In addition, rather than finding ambiguity in the terms of Paragraph 8 regarding the parties' intent to waive negligence claims against each other, the dissenting judge determined that "[i]ncluding an insurance requirement is evidence of the parties' intent to relieve the other from any liability or damages, including damages related to negligence." *Id.* at ___, 803 S.E.2d at 679.

On 20 September 2017, defendants filed a notice of appeal based upon the dissent in the Court of Appeals. They also filed a petition for discretionary review of additional issues, which this Court allowed on 1 November 2017. *Morrell v. Hardin Creek, Inc.*, ___ N.C. ___, 805 S.E.2d 695 (2017).

Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2017). A ruling on a motion for summary judgment must consider the evidence in the light most favorable

to the non-movant, drawing all inferences in the non-movant's favor. *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). The standard of review of an appeal from summary judgment is de novo. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation omitted). Likewise, whether the language of a contract is ambiguous is a question of law to be reviewed de novo. *See Bicket v. McLean Secs., Inc.*, 124 N.C. App. 548, 553, 478 S.E.2d 518, 521 (1996) (citations omitted).

## Analysis

A. Claims Against Hardin Creek

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) (citing *Lane v. Scarborough*, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973)). "The heart of a contract is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Gould Morris Elec. Co. v. Atl. Fire Ins. Co.*, 229 N.C. 518, 520, 50 S.E.2d 295, 297 (1948) (citation omitted). Although parties may generally contract "to bind themselves as they see fit," "contracts exempting persons from liability for negligence are not favored by the law, and are strictly construed against those relying thereon." *Hall v. Sinclair Ref. Co.*, 242 N.C. 707, 709, 89 S.E.2d 396, 397-98 (1955).

For this reason, exculpatory clauses will not be "construed as to exempt the indemnitee from liability for his own negligence or the negligence of his employees in the absence of explicit language clearly indicating that such was the intent of the parties." *Hill v. Carolina Freight Carriers Corp.*, 235 N.C. 705, 710, 71 S.E.2d 133, 137 (1952). Thus, even when the issue before a court is whether an agreement exempts a party thereto from liability for its own negligence, the central question remains the same as in any contract interpretation case: what did the parties intend? "[W]hen the language of the contract and the intent of the parties are clearly exculpatory, the contract will be upheld." *Gibbs*, 265 N.C. at 467, 144 S.E.2d at 400.

As previously noted, the cases relied upon by the majority below are decisions of the Court of Appeals—*William F. Freeman, Inc. v. Alderman Photo Co.*, 89 N.C. App. 73, 365 S.E.2d 183 (1988), and *Lexington Insurance Co. v. Tires Into Recycled Energy & Supplies, Inc.*, 136 N.C. App. 223, 522 S.E.2d 798 (1999), *disc. rev. denied*, 351 N.C. 642, 543 S.E.2d 872 (2000)—that in turn were based upon this Court's decision in *Winkler*. We stated in *Winkler* that "[c]ontracts for exemption from liability for negligence are not favored by the law, and are strictly construed against the party asserting it. The contract will never be so interpreted *in the absence of clear and explicit words that such was the intent of the parties*." *Winkler*, 238 N.C. at 596, 79 S.E.2d at 190 (emphasis added) (citation omitted). A close examination of the facts in *Winkler* is useful in understanding why the Court of Appeals erred in finding that

-14-

the lease in the instant case was ambiguous regarding the parties' intent to exempt

each other for liability for negligence.

*Winkler* arose from an action brought by the plaintiff-landlord against his

tenant for damages incurred when a theater building burned, allegedly as the result

of the defendant-tenant's negligent operation of a popcorn machine. *Id.* at 589, 79

S.E.2d at 186. In the trial court, the defendant-tenant asserted, *inter alia*, "that the

language of paragraphs 3 and 9 of the lease relieved the defendant from liability for

damages by fire, no matter if caused by its own negligence" and the plaintiff-landlord

was nonsuited. *Id.* at 594, 79 S.E.2d at 189. On appeal, just as in the instant case,

this Court considered whether two lease provisions were ambiguous regarding the

parties' intent as to the allocation of risk from the tenant's negligence:

> The first question involved is: Whether the words in
> the lease in paragraph 9 "the lessees agree that they will,
> at the expiration of this lease, deliver up and return
> possession of the premises to the lessors in as good order,
> repair and condition as at present, ordinary wear and tear
> excepted, and damage by fire . . . excepted," and the words
> in paragraph 3 "the lessees . . . shall, at their own cost and
> expense, *make any and all repairs* that may be necessary
> inside the portion of the building hereby demised,
> excepting in case of destruction or damage by fire," exempt
> the defendant from liability for damage by fire caused by
> its actionable negligence, if there was such actionable
> negligence on its part.

*Id.* at 596, 79 S.E.2d at 190-91 (ellipses in original) (emphasis added). This Court

noted the "implied obligation on the part of the lessee to use reasonable diligence to

treat the premises demised in such manner that no injury be done to the property, but that the estate may revert to the lessor undeteriorated by the willful or negligent act of the lessee," *Id.* at 594-95, 79 S.E.2d at 189, and then observed:

> Similar words [to those in the theatre lease] have been used in leases for many years to relieve the lessee from any liability caused by accidental fires, or fires caused by the wrongful act of another. Did these words mean that the lessee was to be exculpated from a fire which was the result of its own negligence? Such a concession would scarcely be looked for in a contract between business men. If the parties intended such a contract, we would expect them to so state in exact terms. It would be natural for the lessee, who had contracted to keep up repairs, to desire to escape liability for purely accidental fires and for the lessor to be willing to grant that relief, but it would not be natural that the lessor would be willing to release the lessee from damage caused by its own active negligence. In our opinion, the words in paragraphs 9 and 3 of the lease do not exempt the defendant from liability for fire damage, if caused by its actionable negligence.

*Id.* at 596, 79 S.E.2d at 191. This Court therefore determined that the requirements in paragraphs 3 and 9 that the theatre be returned to the landlord in "good order" and "undeteriorated" other than by ordinary wear and tear, and that the tenant bear the costs of all such needed repairs other than those caused by fire, did not reveal a clear intent to go beyond the typical or "natural" contractual bargain and waive a party's liability for damages caused by that party's own negligence. *Id.* at 598, 79 S.E.2d at 192.

-16-

The Court went on in *Winkler* to reject the defendant-tenant's contention that another paragraph of the lease providing "that the lessor shall keep the building insured to the extent of its full insurable value[ ] exculpate[d] the defendant from liability for fire damage caused proximately by its negligence." *Id.* at 597, 79 S.E.2d at 191. While acknowledging that "[u]pon paying a loss by fire, the insurer is entitled to subrogation to the rights of insured against the third person tort-feasor causing the loss, to the extent of the amount paid," the Court opined that the fact "that the insurer is entitled to recoup its loss out of what the defendant owes the plaintiff for having negligently destroyed the insured building is of no legal concern to the defendant." *Id.* at 597-98, 79 S.E.2d at 191-92. Accordingly, the Court concluded that "the language in the [theatre] lease does not expressly or impliedly exempt the defendant from liability for any damage by fire to the demised premises caused proximately by its negligence." *Id.* at 598, 79 S.E.2d at 192.

The language in Paragraph 5(b) in the case at bar cited as exculpatory by defendants and in the Court of Appeals dissent is readily distinguishable from the provisions in *Winkler* that were deemed to lack a clear demonstration of the parties' intent to indemnify each other for negligence. Rather than merely referring to the tenant's duty to return the premises in "good order" and to "make any and all repairs," the lease here explicitly exempted the parties "from *all claims and liabilities* arising from or caused by *any hazard* covered by insurance on the leased premises . . . *regardless of the cause of the damage or loss*." (Emphasis added). Indeed, plaintiffs

-17-

acknowledge that "this language is broad and expansive enough to encompass a wide range of claims against Hardin Creek," while asserting that "it is that very breadth that makes the clause unable to satisfy the exacting standard under North Carolina law for relieving Hardin Creek from liability for its own negligence." Plaintiffs' chameleonic construction of this contractual language is unworkable. Given the "broad and expansive" nature of the phrase "all claims and liabilities . . . regardless of the cause of the damage or loss," it is a challenging exercise to conjure up language in an exculpatory clause that would meet plaintiffs' implied standard for unambiguity regarding waiver of negligence-based claims other than to require such a waiver to explicitly mention the term "negligence." Neither *Winkler* nor any other precedent from this Court, however, requires that a contract expressly include the term "negligence" in order for an exculpatory clause to be enforced in the context of negligence claims. Instead, such provisions must simply contain "clear and explicit words that such was the intent of the parties." *Winkler*, 238 N.C. at 596, 79 S.E.2d at 190 (citation omitted). Here the phrase "from *all claims* and liabilities arising from or caused by any hazard covered by insurance on the leased premises . . . regardless of the cause of the damage or loss" is explicitly and effectively exculpatory as to "all claims," including those grounded in tort and caused by Hardin Creek's alleged negligence, which result from a "hazard covered by insurance . . . regardless of the cause of the damage or loss." (Emphasis added).

Plaintiffs argue that the language in Paragraph 5(b) cannot be read to obligate them to indemnify Hardin Creek from liability for claims for business losses—not covered by insurance—arising from Hardin Creek's negligence or other misconduct. Plaintiffs misapprehend the lease provision. A plain reading of Paragraph 5(b) reveals that the only limit on the scope of the exculpatory clause is not the type of *losses* suffered, but the type of *hazard* that caused those losses. If the hazard that caused plaintiffs' alleged damages was covered by insurance—and it is undisputed that the hazard of flooding that caused plaintiffs' alleged damages was covered by insurance—then plaintiffs are barred from bringing an action against Hardin Creek for "all claims and liabilities" caused thereby, including "business losses."

The dissent views the language at issue in Paragraph 5(b) of the lease in such a manner so as to gratuitously equate plaintiffs' interpretation of said language with defendants' construction of this provision. In examining this disputed language and evaluating the parties' respective positions concerning it, the dissent concludes that "each provides a plausible interpretation of the plain language." Based on the faulty premise that plaintiffs' version of the legal effect of the contested language in Paragraph 5(b) substantively establishes an ambiguity in the provision's terminology, the dissent thereupon conveniently applies well-established rules of contract interpretation pertaining to ambiguities and resorts to consultation of other provisions of the lease in an effort to cultivate an ambiguity which was not planted in the contract. This approach is further exacerbated by the dissent's resolve to both

stretch and invert this Court's reasoning in *Winkler* in an attempt to rationalize the applicability of such reasoning to the parties in the instant case, even though they occupy diametrically opposite positions from the parties in *Winkler*. Due to an initial erroneous supposition that plaintiffs' depiction of Paragraph 5(b)'s language at issue as ambiguous is meritorious, coupled with a misplaced reliance on the applicability of N.C.G.S. § 22B-1's public policy declarations which do not apply to a building outside of a contract "relative to the design, planning, construction, alteration, repair or maintenance," the dissent's resulting analyses are misoriented and the ultimate conclusions are unwarranted.

We likewise reject plaintiffs' contention that the above-quoted portion of Paragraph 5(b) is a waiver of subrogation clause that must be interpreted in context with the other provisions of the lease respecting insurance and not be enforced beyond the scope of the specific context in which it appears. In plaintiffs' view, this Court must look to the terms of Paragraph 8, which covers insurance requirements under the lease, to understand the parties' intent in Paragraph 5(b). Paragraph 8 required plaintiffs to maintain property insurance to "hold Landlord harmless for loss or damage by fire" and to maintain liability insurance to protect "the general public and Landlord . . . against claims for bodily injury or death." Plaintiffs suggest that those requirements delimit the reference to "any hazard covered by insurance on the leased premises" in Paragraph 5(b), and as a result, Paragraph 8 would not require plaintiffs to maintain property insurance for flood damage or for property damage greater than

$100,000.00, and the exculpatory language in Paragraph 5(b) cannot apply to claims arising from those hazards. In effect, plaintiffs ask this Court to read into Paragraph 5(b) the equivalent of the following bracketed language:

> Landlord and Tenant and all parties claiming under them agree and discharge each other from all claims and liabilities [other than negligence and intentional torts] arising from or caused by any hazard covered by insurance [as specifically required under the terms of Paragraph 8 of this lease] on the leased premises, or covered by insurance [as specifically required under the terms of Paragraph 8 of this lease] in connection with the property owned or activities conducted on the leased premises, regardless of the cause of the damage or loss [excepting intentional or negligent acts of the Landlord], provided that such cause does not prevent payment of insurance proceeds to Landlord under the provisions of the applicable policy[; and with the proviso that the minimum policy limits of the insurance required in Paragraph 8 shall serve as the limits on the liability for claims brought pertinent to this provision].

The parties here could have entered into such an agreement that included the imagined terms bracketed above, which plaintiffs intimate should be inferred in construing Paragraph 5(b), but the parties did not do so. This Court cannot creatively interpret the parties' actual lease agreement in the manner urged by plaintiffs, and must instead enforce the parties' intent as evidenced by the clear and explicit language of the lease. *See Dawes v. Nash County*, 357 N.C. 442, 449, 584 S.E.2d 760, 764 (2003) (stating that "courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein" (quoting *Woods v.*

*Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978))). The lease executed by plaintiffs and Hardin Creek unequivocally demonstrates the parties' intent to hold each other harmless regarding *all* liability for damage and loss arising from hazards covered by the insurance obtained for the premises. The parties do not dispute that the flooding of plaintiffs' leased premises was a hazard covered by insurance on the premises. Plaintiffs' complaint does not allege that the acts or omissions of any defendant prevented payment of insurance proceeds that became due as the result of covered hazards, although the complaint alleges that plaintiffs' damages exceeded their insurance policy limits. The trial court was correct in finding that Paragraph 5(b) is unambiguous and functions as a complete defense to plaintiffs' claims lodged against Hardin Creek, the only defendant that was undisputedly a party to the contract. Accordingly, we reverse the decision of the Court of Appeals with regard to all of plaintiffs' claims with regard to Hardin Creek and find that the trial court properly granted summary judgment in favor of Hardin Creek.

B. Claims Against S. Greene, Timberframe, and E. Greene

The trial court granted summary judgment in favor of defendants S. Greene and Timberframe and also dismissed plaintiffs' third-party complaint against E. Greene with prejudice. The dissent below did not address these issues, but the Court of Appeals majority determined that the case should be remanded to the trial court to reconsider both matters. We agree with the lower appellate court's approach

regarding these claims, in light of the insufficiency of the record to allow this Court to fully assess the correctness of the trial court's allowance of the dispositive motions of defendants S. Greene, Timberframe, and E. Greene.

Although we reverse the Court of Appeals in its erroneous analysis of the lease, we agree that the record is not sufficiently developed for our consideration of the involvement of Timberframe and the individual defendants regarding modifications to the premises. Therefore, we remand these matters to the trial court for reconsideration of the remaining claims.

C. Hardin Creek's Counterclaims

As previously noted, Hardin Creek's counterclaims for negligence and breach of contract were dismissed *sua sponte* by the trial court pursuant to N.C.G.S. § 1A-1, Rule 56(c). At the time that the trial court dismissed these counterclaims, no discovery had been conducted with respect to them, and they were not argued by the parties at the hearing on defendants' summary judgment motion. Under these circumstances, Hardin Creek contends that the basis for the trial court's dismissal of said counterclaims could only have been that the exculpatory clause, applying equally to Hardin Creek and to plaintiffs, concomitantly provided a complete defense to plaintiffs' claims and Hardin Creek's counterclaims. We agree that this is the only reasonable interpretation of the trial court's order, and therefore proceed on this premise.

In the Court of Appeals, Hardin Creek's brief addressed the dismissal of its counterclaims as follows:

> Without diminishing the strength of [d]efendants' argument that the Exculpatory Clause is valid and enforceable and bars [p]laintiffs' claims, [d]efendants, in the alternative, ask the [Court of Appeals] to apply the Exculpatory Clause equally to both parties; and if the summary judgment in favor of [d]efendants is reversed, the [c]ourt should reverse the dismissal of the counterclaims.

Plaintiffs characterized this language as only summarily addressing the dismissal of the counterclaims, and the Court of Appeals agreed, opining:

> [d]efendants fail to argue this issue and do not present this [c]ourt with a reason to disturb the trial court's order granting summary judgment in favor of [p]laintiffs as to [d]efendants' counterclaims. Defendants have abandoned this issue on appeal, and we consequently affirm the trial court's ruling as to [d]efendants' counterclaims.

*Id.* at ___, 803 S.E.2d at 676. We believe the Court of Appeals erred in determining that Hardin Creek abandoned this issue on appeal.

Whether the trial court erred in its resolution of Hardin Creek's counterclaims against plaintiffs depended on the same essential issue as did consideration of the trial court's resolution of plaintiffs' claims against Hardin Creek, namely, a determination of the meaning and effect of the exculpatory clause. Accordingly, the same facts, arguments, and authorities were pertinent to this element of the case. A repetition of these facts, arguments, and authorities would have served no useful

purpose. Under the specific circumstances presented here, we therefore conclude that Hardin Creek did not abandon its counterclaims issue on appeal and instead sufficiently presented the matter for review.

In light of our determination that the exculpatory clause bars plaintiffs' claims against Hardin Creek, this provision also bars Hardin Creek's counterclaims against plaintiffs. Therefore, although we disavow the reasoning and holding of the Court of Appeals with regard to preservation of the counterclaims issue on appeal, the ultimate result as to the resolution of Hardin Creek's counterclaims remains the same. The trial court's grant of summary judgment in favor of plaintiffs on defendant Hardin Creek's counterclaims is upheld.

Conclusion

We affirm in part, affirm in part as modified, and reverse in part the decision of the Court of Appeals, and we remand this matter to that court for further remand to the trial court. While the summary judgment order is left undisturbed with regard to the claims of plaintiffs against Hardin Creek and Hardin Creek's counterclaims against plaintiffs, on remand the trial court should consider plaintiffs' claims against the other original defendants, plaintiffs' motion to add E. Greene as a defendant, and any discovery motions implicated thereby.

AFFIRMED IN PART; MODIFIED AND AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Justice BEASLEY, concurring in part and dissenting in part

The majority today holds that an exculpatory clause in a commercial lease absolves the landlord from liability for his improper construction or oversight of construction of improvements pursuant to a lease modification agreement. In doing so, the majority construes the written contract in favor of the drafter, construes an exculpatory clause in favor of the party benefiting thereunder, and approves of the grant of summary judgment in a case in which multiple genuine issues of material fact have yet to be determined. For these reasons, I must respectfully dissent in part from the majority's opinion.

Plaintiffs' claims against defendants included: (1) negligence against John Sidney Greene (S. Greene), Hardin Creek, Inc. (Hardin Creek), and Hardin Creek Timberframe and Millwork, Inc. (Timberframe); (2) breach of the implied warranty of workmanlike performance against the same defendants; (3) constructive eviction against Hardin Creek; (4) breach of the lease agreement's covenant of quiet enjoyment against Hardin Creek; and (5) unfair and deceptive trade practices against S. Greene and Hardin Creek.

In their motion for summary judgment, defendants alleged that Hardin Creek "was the entity responsible for getting the modifications done" and, therefore, no claim of negligence against S. Greene or Timberframe could lie. Defendants further alleged that there was no privity of contract between plaintiffs and S. Greene, or between plaintiffs and Timberframe and, therefore, no claims for breach of the

implied warranty of workmanlike performance could lie against these defendants. Defendants alleged that Hardin Creek "was ready, willing, and able to restore the premises" after the flooding event, but plaintiffs quit the lease before repairs could be made. Therefore, defendant Hardin Creek could not be liable for constructive eviction or breach of the covenant of quiet enjoyment. Finally, defendants argued that paragraph 5(b) of the lease discharged any liability of Hardin Creek to plaintiffs as to all five of the claims brought against it.

The trial court found that paragraph 5(b) was "a complete defense to the claims raised in the Complaint" and that there were no genuine issues of material fact with respect to any of the claims raised in plaintiffs' complaint or the counterclaims raised in defendants' amended answer. The Court further found that plaintiffs' third-party complaint raised the same claims as the original complaint and was "substantively and substantially identical to the proposed Amended Complaint." Based upon those findings, the trial court summarily dismissed all claims against all parties.[1]

---

[1] Although the Court of Appeals did not reach this issue, I am compelled to briefly note the troubling litigation tactics employed by defendants in this case, which plaintiffs did raise on appeal to the Court of Appeals.

Defendants did not fully respond to discovery until being compelled by court order to do so on 26 February 2016, more than one year after discovery requests were first filed. Over the next six weeks, plaintiffs learned that legal title to the leased premises was actually vested in S. Greene's son and that a previously undisclosed agency relationship existed, and their counsel was flooded with an amended answer containing counterclaims, 1,200 pages of new discovery, six scheduled depositions (two of which were expert witnesses that defendants cancelled just days prior), a mediation conference, a motion to strike, and a motion for summary judgment, which defendants noticed for 10:00 a.m. on 25 April 2016 with a request that it not *actually* be heard until after 4:00 p.m., or the next day, or later in the week, because the parties' previously scheduled mediation was *also* being held at 10:00 a.m. that

## *Analysis*

## I. Standard of Review

When the trial court allows or denies a motion for summary judgment, we review that ruling de novo. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citing *Forbis v. Neal*, 361 N.C. 519, 523-24, 649 S.E.2d 382, 385 (2007)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2017).

---

same day. Plaintiffs moved to continue the hearing and were being heard on that motion when the trial court abruptly ordered summary judgment, in part *sua sponte*, for all defendants. Plaintiffs have, by all accounts, prosecuted their claims diligently and in good faith, while defendants have benefited from dilatory and prejudicial tactics.

Rule 6(b) of the North Carolina Rules of Civil Procedure provides that the trial court may, in its discretion and upon a showing of cause, enlarge the time within which any act is required to be done. N.C.G.S. § 1A-1, Rule 6(b) (2017). In deciding whether, in its discretion, to grant a motion for continuance, the chief consideration is whether the grant or denial will be in furtherance of substantial justice. *Shankle v. Shankle*, 289 N.C. 473, 483, 223 S.E.2d 380, 386 (1976). Additionally, we have stated that "it is error for a court to hear and rule on a motion for summary judgment when discovery procedures, which might lead to the production of evidence relevant to the motion, are still pending and the party seeking discovery has not been dilatory in doing so." *Conover v. Newto*n, 297 N.C. 506, 512, 256 S.E.2d 216, 220 (1979). It is clear from the record before us that multiple issues of fact remained to be determined, that plaintiffs had diligently pursued discovery for the preceding nine months, and that plaintiffs reasonably expected to be given an opportunity to flesh out those remaining issues of fact by completing discovery. This Court would certainly have benefited from a more fully developed record. Under these circumstances, I would hold that the trial court abused its discretion in denying plaintiffs' motion to continue.

"[T]he real purpose of summary judgment is to . . . pierce the pleadings and determine whether there is a genuine issue of material fact," *Singleton v. Stewart*, 280 N.C. 460, 464, 186 S.E.2d 400, 403 (1972), in order to "eliminate formal trials where only questions of law are involved." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). "The party moving for summary judgment has the burden of clearly establishing the lack of any triable issue of fact." *Singleton*, 280 N.C. at 464, 186 S.E.2d at 403 (citation omitted). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or establish any material element of a claim or defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citing *Bone International, Inc. v. Brooks*, 304 N.C. 371, 375, 283 S.E.2d 518, 520 (1981)). .

## II. Scope of Exculpatory Clause

Because the trial court allowed summary judgment solely based on paragraph 5(b) of the lease agreement, this is principally a matter of contract interpretation. "The heart of a contract," i.e., the genuine issue, "is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Gould Morris Elec. Co. v. Atl. Fire Ins. Co.*, 229 N.C. 518, 520, 50 S.E.2d 295, 297 (1948). When the intent of the parties is clearly expressed in a written contract that contains no ambiguities requiring resort to extrinsic evidence or consideration of disputed facts, the contract may be interpreted as a matter of law. *Lane v. Scarborough*, 284 N.C. 407, 410, 200

S.E.2d 622, 624 (1973). However, when an ambiguity exists, the intention of the parties is a genuine issue of material fact to be determined by the jury, and summary judgment is inappropriate. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 525, 723 S.E.2d 744, 748 (2012) (finding summary judgment improper when parties disputed the meaning of a provision in their contract and construction of the document was required to ascertain their intent).

"An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Id.* at 525, 723 S.E.2d at 748 (quoting *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.*, 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008)); *see also St. Paul Fire & Marine Ins. Co. v. Freeman-White Assocs.*, 322 N.C. 77, 366 S.E.2d 480 (1988) (finding dismissal improper when parties' disagreement about extent of insurance waiver provisions and assignment of risk of loss indicated ambiguity). The majority declares that the lease uses "clear and explicit language" which "unequivocally demonstrates the parties' intent to hold each other harmless regarding *all* liability for damage and loss arising from hazards covered by the insurance obtained for the premises."

But the parties contest the applicability and scope of the subparagraph at issue, and each provides a plausible interpretation of the plain language thereof. The entire provision disputed by the parties reads as follows:

> (b)     Tenant's Neglect. Subject to the provisions set forth in the following sentence, Tenant shall pay for the

> cost of any repairs or damage resulting from the negligence or the wrongful acts of his employees, representatives or visitors. However, and notwithstanding any other provision of this lease to the contrary, Landlord and Tenant and all parties claiming under them agree and discharge each other from all claims and liabilities arising from or caused by any hazard covered by insurance on the leased premises, or covered by insurance in connection with the property owned or activities conducted on the leased premises, regardless of the cause of the damage or loss, provided that such cause does not prevent payment of insurance proceeds to landlord under the provisions of the applicable policy.

Defendants argue that, under this provision of the lease, if the hazard is covered by insurance, then all claims and liabilities arising out of that hazard are discharged, regardless of the amount of insurance and regardless of the nature of the claim. Plaintiffs contend that the same language releases each party from liability for "any claim" that is (1) caused by hazard and (2) covered by insurance. The majority opinion adopts defendants' interpretation by zeroing in on the words "all claims . . . arising from . . . any hazard covered by insurance." In doing so, the majority asserts that the plain reading is that "covered by insurance" modifies "hazard," not "claims," and therefore, if the hazard that caused the damage was covered by insurance, plaintiffs are barred from bringing *any* claim against defendant landlord related to that hazard. While this is certainly a reasonable interpretation of that language, so too is the interpretation offered by plaintiffs. Because both interpretations of the exculpatory clause are reasonable, a genuine issue of material fact remains, and the task of ascertaining the true intent of the parties at the time of contract formation is

one for the jury, not the Court.

Despite asserting that the language is "clear and explicit," the majority goes on to construe that language, and does so in contravention of well-established rules of interpretation by resolving the ambiguity in favor of the drafter, *Root v. Allstate Ins. Co.*, 272 N.C. 580, 585, 158 S.E.2d 829, 834 (1968) (noting the rule that any "ambiguity in a written contract is to be construed against the party who prepared the instrument" (citing *Wilkie v. New York Mut. Life Ins. Co.*, 146 N.C. 513, 521, 60 S.E. 427, 430 (1908)); expressly declining to consider the contract provision in the context of the whole agreement, *Jones v. Casstevens*, 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) (stating the rule that "[s]ince the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety" (quotation and citation omitted)); and, rather than strictly construing the exculpatory clause, giving it the broadest possible interpretation, *Hall v. Sinclair Ref. Co.*, 242 N.C. 707, 709, 89 S.E.2d 396, 397-98 (1955) (noting that "contracts exempting persons from liability for negligence are not favored by the law, and are strictly construed against those relying thereon"); *Hill v. Carolina Freight Carriers Corp.*, 235 N.C. 705, 710, 71 S.E.2d 133, 137 (1952) (stating that strict construction requires "explicit language clearly indicating that such was the intent of the parties"). The majority also fails to adhere to the principle that, in this procedural posture, we are required to view the evidence in the light most favorable to the nonmovant, the plaintiff lessees. These rules combine to mean that, in this case, any time we are asked to choose between

the meaning assigned by or most favorable to defendant landlord (the drafter and party seeking benefit of the exculpatory clause) and the meaning assigned by or most favorable to plaintiff lessees, the latter must prevail for purposes of determining whether summary judgment was appropriate. Not only that, but to give the language the meaning urged by defendants, we must find that it clearly and expressly states the parties intention to exculpate defendant from liability for his own negligence, and is clearly not susceptible to the meaning offered by plaintiffs.

The majority distinguishes the contract provision at issue here from the provision considered by this Court in *Winkler v. Appalachian Amusement Co.*, 238 N.C. 589, 79 S.E.2d 185 (1953). The majority finds the distinction between the exculpatory language at issue in *Winkler* and this lease's exculpatory language so significant as to warrant a completely contrary holding. But the underlying reasoning of the holding in *Winkler* is entirely applicable to the case at bar. There we noted that:

> It would be natural for the lessee, who had contracted to keep up repairs, to desire to escape liability for purely accidental fires and for the lessor to be willing to grant that relief, but it would not be natural that the lessor would be willing to release the lessee from damage caused by its own active negligence.

*Id.* at 596, 79 S.E.2d at 190-91. The same reasoning is applicable here where the liabilities are reversed. It would be natural for the lessor, who had contracted to make a repair, to desire to escape liability for purely accidental hazards and for the

lessee to be willing to grant that relief, but it would not be natural that the lessee would be willing to release the lessor from damage caused by the lessor's own active negligence. In *Winkler* we concluded that the language at issue did not evince a clear intent to go beyond the "natural" contractual bargain by waiving one party's liability to the other for its own active negligence. *Id.* at 596, 79 S.E.2d at 191. Evidence of that clear intent is necessary because, as the majority correctly notes, we must strictly construe contracts that purport to exempt a party from its own negligence. *Hall*, 242 N.C. at 709, 89 S.E.2d at 397-98.

I agree with plaintiffs that the broad and expansive language of paragraph 5(b) cannot be read by this Court to explicitly express an intention that the lessor be exculpated from its own active negligence. This argument is not "chameleonic." It is a correct interpretation of this Court's holdings spanning more than sixty years. *See, e.g.*, *Schenkel & Shultz*, 362 N.C. at 274-75, 658 S.E.2d at 922 (distinguishing indemnity clauses which may be broadly construed "to cover all losses, damages, and liabilities which reasonably appear to have been within the contemplation of the parties" from exculpatory clauses which "are not favored by the law" and must be "strictly construed against the party asserting it" (first quoting *Dixie Container Corp. v. Dale*, 273 N.C. 624, 627, 160 S.E.2d 708, 711 (1968), then quoting *Hill*, 235 N.C. at 710, 71 S.E.2d at 137)); *Gibbs v. Carolina Power & Light Co.*, 265 N.C. 459, 467, 144 S.E.2d 393, 400 (1965) (noting that in "contracts whereby one seeks to wholly exempt himself from liability for the consequences of his negligent acts," both the language

of the contract and intent of the parties must be "clearly exculpatory" and will be strictly construed (citing *Winkler*, 238 N.C. 589, 79 S.E.2d 185)); *Dixie Fire & Cas. Co. v. Esso Standard Oil Co.*, 265 N.C. 121, 126, 143 S.E.2d 279, 283 (1965) (strictly construing lease provision requiring lessor to make all repairs and declining to exempt lessee from its own negligence thereunder); *Hill*, 235 N.C. at 710, 71 S.E.2d at 137 (noting the "universal rule" that a clause exempting a person from liability for his own negligence is "strictly construed against the party asserting it"); *cf. Hall*, 242 N.C. at 709-11, 89 S.E.2d at 397-98 (strictly construing a contract provision which discharged a defendant "from any and all claims, demands and liability for any loss, damage, or injury, . . . by reason of any other casualty, whether due to the negligence of [the defendant] or otherwise" and finding the language sufficiently clear and explicit (first alteration in original)). If a party intends to be released from liability for its own active or passive negligence, it must so state in explicit terms. Hardin Creek did not. I can find no reason why the language at issue here differs so materially from that at issue in *Winkler* as to require a contrary holding.

The majority also rejects outright plaintiffs' reasonable contention that the exculpatory clause must be interpreted in the context of the whole agreement, particularly with respect to the other provisions of the lease requiring coverage by insurance. The Court of Appeals correctly looked to the entire contract, noting that the phrases in paragraph 5(b)—"any hazard covered by insurance" and "payment of insurance proceeds"—required reference to another paragraph of the lease setting

out the parties' intentions as to the required insurance coverages and the assignment of risk between them. *Morrell v. Hardin Creek, Inc.*, ___ N.C. App. ___, ___, 803 S.E.2d 668, 674 (2017). The majority today claims that it cannot look to other provisions of the lease without adding language to the disputed paragraph explicitly referencing the other provision. I can find no support in the law for this reasoning. In fact, the majority's rationale appears contrary to the fundamental law of contracts. *See, e.g.*, Restatement (Second) of Contracts § 202(2) (Am. Law Inst. 1979) ("A writing is interpreted as a whole . . . ."); 17A C.J.S. *Contracts* § 399, at 287 (collecting cases and stating the rule that "[a] contract must be interpreted or considered as a whole, or in its entirety"); R. Lord, 11 Williston on Contracts § 32:1, at 603 (4th ed. 2012) ("Primary rules of interpretation are always used by the courts to determine the meaning of particular words or clauses found in a contract, and the contract as a whole, regardless of whether the parties' writing is clear or ambiguous."). It is not necessary that paragraph 5(b) expressly reference paragraph 8. We need not be directed by the drafter to look at another paragraph. Our rules of construction require that we do so to ascertain the meaning which, as nearly as possible, approximates the parties' intentions at the time of contract formation. *Atl. & N.C. R. Co. v. Atl. & N.C. Co.*, 147 N.C. 368, 61 S.E 185, 189-90 (1908) (discussing the need to review contract language in light of the whole agreement). The majority acknowledges that its reading of the disputed paragraph requires reference to "the insurance obtained for the premises" and then refuses to consider the text of the lease

setting out what that insurance might be.  We are required to construe the language of paragraph 5(b) not as a singular clause, but as a clause contained within a larger paragraph which is part of the whole contract which in its totality expresses the intention of the parties.  Determining the intention of the parties requires reference to the entire contract.  Again, the task of ascertaining the parties' intention at the time of contract formation is one for the jury, not this Court.

Additionally, I agree with plaintiffs that, by statute, this promise to alter the building cannot include a waiver of liability for negligence[2] because such agreements are explicitly against public policy:

> Any promise or agreement . . . relative to the . . . alteration, repair or maintenance of a building . . . purporting to indemnify or hold harmless the promisee, the promisee's independent contractors, agents, employees, or indemnities against liability for damages arising out of . . . damage to property proximately caused by or resulting from the negligence . . . of the promisee, its independent contractors, agents, employees, or indemnitees, is against public policy and is void and unenforceable.

N.C.G.S. § 22B-1 (2017).[3]  Therefore, even if we assume, *arguendo,* that the parties

---

[2] In addition to the statutory mandate that one who contracts to improve a building may not seek to exculpate himself for negligence relative thereto, the landlord who undertakes to make repairs is also under a duty, implied by law, to do so with care. *Bolkhir ex rel Bolkhir v. N.C. State Univ.*, 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988).  Additionally, enforcement of exculpatory clauses between parties whose legal relationship gives rise to special duties is against public policy. *See Hall*, 242 N.C. at 710, 89 S.E.2d at 398 (recognizing that public policy prohibits a public utility from contracting to discharge its own negligence and that "[t]he limitation is likewise uniformly applied to certain relationships such as that of master and servant" (quoting *Miller's Mut. Fire & Ins. Ass'n of Alton, Ill. v. Parker*, 234 N.C. 20, 22, 65 S.E.2d 341, 342 (1951))).

[3] The majority contends that the statute is inapplicable because the contract between

originally intended to discharge the lessor from liability for his own negligence, to the extent that the agreement for the alteration of the building incorporated paragraph 5(b), the exculpatory clause cannot apply to the lessor's promise to alter the building. Our General Assembly has expressly declared such a promise to be void as against public policy, and this Court therefore has no jurisdiction to enforce it. *See Associated Mech. Contractors, Inc. v. HDR Eng'g Inc. of the Carolinas*, 178 F.3d 1282, 1999 WL 253539, at *5 (per curiam) (unpublished) (4th Cir. 1999) (noting that the statute allows the promisor to indemnify the promisee for damages caused solely by the promisor's negligence, but that defendant's indemnification provision could not be otherwise enforced); *accord Jackson v. Associated Scaffolders & Equip. Co.*, 152 N.C. App. 687, 690-91, 568 S.E.2d 666, 668 (2002) (applying the statute to hold indemnity clause in construction contract void as against public policy and therefore unenforceable).

## *Conclusion*

I would hold that determination of the full scope of paragraph 5(b) relative to the alteration of the leased premises is a genuine issue of material fact that ought to be submitted to a jury and that the trial court must determine whether, to the extent

---

the parties is not "relative to the design, planning, construction, alteration, repair or maintenance" of a building. This assertion fails, however, to recognize that the damage involved was, at least arguably, caused by the negligent "alteration" of the building by S. Greene who very well may have been acting at the time in his capacity as a licensed general contractor, rather than in his capacity as agent for the landlord. Again, these are genuine issues of material fact more appropriately resolved by a jury.

the exculpatory clause purports to shield defendants from liability for their own negligence in altering the building, it is void as against public policy. I would also hold that paragraph 5(b) is ambiguous as demonstrated by the parties' differing, reasonable interpretations of its meaning; and that resolution of the ambiguity requires determination of issues of fact properly within the province of the jury. Consequently, I would affirm the decision of the Court of Appeals below which held that the trial court erred in allowing the motion for summary judgment in favor of defendant Hardin Creek and remand to that court with instructions to further remand for determination of these issues by the trial court.

I concur in that part of the majority's opinion which affirms the Court of Appeals' decision to remand this matter to the trial court for reconsideration of the liability of the remaining parties; however, I dissent as to that part of the opinion which concludes that the lease provision at issue is a complete bar to plaintiffs' claims against Hardin Creek, and for the same reasons, I also dissent as to that part of the majority's opinion which disavows the Court of Appeals' decision with regard to preservation of defendants' counterclaims.